# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2014AP108-CR |
| COMPLETE TITLE: | State of Wisconsin, |
| | Plaintiff-Respondent-Petitioner, |
| | v. |
| | Charles V. Matalonis, |
| | Defendant-Appellant. |

REVIEW OF A DECISION OF THE COURT OF APPEALS
(Reported at 359 Wis. 2d 675, 859 N.W.2d 628)
(Ct. App. 2015 – Unpublished)

| | |
|---|---|
| OPINION FILED: | February 10, 2016 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | September 18, 2015 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
| COURT: | Circuit |
| COUNTY: | Kenosha |
| JUDGE: | Wilber W. Warren, III |

| | |
|---|---|
| JUSTICES: | |
| CONCURRED: | |
| DISSENTED: | ABRAHAMSON, J., dissents. (Opinion Filed) |
| | PROSSER, ABRAHAMSON, A.W. BRADLEY, J.J.J., |
| | dissent. (Opinion Filed) |
| NOT PARTICIPATING: | |

ATTORNEYS:

For the plaintiff-respondent-petitioner, the case was argued by *Donald V. Latorraca,* assistant attorney general, with whom on the briefs was *Brad D. Schimel,* attorney general.


For the defendant-appellant, there was a brief by *Mark D. Richards, Brian P. Dimmer* and *Mark D. Richards, S.C.,* Racine, and oral arguments by *Mark D. Richards.*

2016 WI 7

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

No. 2014AP108-CR
(L.C. No. 2012CF81)

STATE OF WISCONSIN                    :        IN SUPREME COURT

State of Wisconsin,

    Plaintiff-Respondent-Petitioner,

    v.

Charles V. Matalonis,

    Defendant-Appellant.

**FILED**

**FEB 10, 2016**

Diane M. Fremgen
Clerk of Supreme Court

REVIEW of a decision of the Court of Appeals. *Reversed and cause remanded.*

¶1  ANNETTE KINGSLAND ZIEGLER, J.   This is a review of an unpublished decision of the court of appeals, State v. Matalonis, No. 2014AP108-CR, unpublished slip op. (Wis. Ct. App. Dec. 23, 2014), which reversed the Kenosha County circuit court's[1] judgment of conviction and order denying defendant Charles V. Matalonis's ("Matalonis") motion to suppress evidence of marijuana production in Matalonis's home.  Police obtained

_____

[1] The Honorable Wilbur W. Warren III presided.

this evidence while investigating the source of injuries sustained by Matalonis's brother, Antony.

¶2 We are asked to determine whether a warrantless search by police of Matalonis's home, including, importantly, of a room secured by a locked, blood-spattered door, was reasonable under the Fourth Amendment of the United States Constitution and Article I, § 11 of the Wisconsin Constitution. The State argues that the police officers in this case acted reasonably on the night in question because (1) the police officers were reasonably exercising a bona fide "community caretaker" function in ensuring the absence of injured persons in the home; and (2) the police officers reasonably believed that a protective sweep of the home was necessary to guarantee their own safety.

¶3 We conclude that the officers in this case reasonably exercised a bona fide community caretaker function when they searched Matalonis's home. The officers therefore were not required to obtain a warrant prior to conducting the search in question, and the evidence of marijuana production they obtained should not be suppressed. Because the search was lawful under the community caretaker doctrine, we need not determine whether the search was also justified as a protective sweep. We reverse the decision of the court of appeals and remand the case to the circuit court for further proceedings consistent with this opinion.

I. FACTUAL BACKGROUND

¶4 On January 15, 2012, at about 2:45 a.m., Officers Brian Ruha ("Officer Ruha") and David Yandel ("Officer Yandel")

2

of the Kenosha Police Department were dispatched for a medical call to the upper unit of an address on 45th Street in Kenosha.[2] When Officer Ruha arrived at the address, he observed "what appeared to be blood all over the door." He knocked on the door, entered, and there met Antony Matalonis ("Antony"). Antony looked as though "he may have been battered[;] . . . his whole right side of his body was covered in blood." Additionally, Antony seemed "highly intoxicated." Antony initially told Officer Ruha that he had been beaten up by four different groups of people outside of a bar, but some time later said that he was beaten up by four people outside of a bar. The resident at the address told Officer Ruha that Antony lived down the street with his brother. Antony was loaded into an ambulance and taken to a hospital.

---

[2] The facts in this section are taken from testimony provided by Officer Ruha, Officer Yandel, and Matalonis at the April 4, 2013 suppression hearing, as well as from portions of the officers' police reports that were read at the suppression hearing. The circuit court stated at the conclusion of the hearing:

> I don't think the material facts are in dispute at all. The only fact that might be in dispute is whether initial consent was given to enter the home or not. But if that issue is of concern, the [c]ourt certainly would find that the officer[s] did have consent to enter the home.

On appeal before this court, Matalonis concedes that he "consented to the [officers'] entering his home to discuss Antony's injuries." Certain disputed facts not material to the outcome of this case will be noted as they arise.

3

¶5 Officer Yandel arrived at the address as Antony was being placed in the ambulance. Officer Yandel "could tell that [Antony] had a bloody face. [Antony] had blood on his shirt. He seemed pretty beat up." Officer Yandel went to the back door leading to the upper unit of the residence, and "noticed a large amount of blood that led up the stairwell to that apartment."

¶6 After the ambulance departed, Officer Ruha and Officer Yandel "checked the surrounding area to determine where [the] blood had originated from" in order to "find out where [Antony] came from . . . and if anyone else was even involved," because the resident of the upper apartment had explained that Antony had arrived at the residence already injured. There was snow on the ground, and the officers found a single "blood trail" in the snow, which they followed.

¶7 The blood led to the side door of a residence on Fifth Avenue. "There was blood on a screen door and then on the inside of the screen door. And there was another wooden door, and there was blood on that door as well." The officers heard two loud bangs coming from inside the residence that sounded to Officer Yandel like "[t]hings being shuffled around in the house."[3]

¶8 The officers then called for backup because, according to Officer Ruha, "we had no idea what was going on inside the

---

[3] During the suppression hearing, Officer Yandel admitted that information regarding the noises did not appear in his police report. Officer Ruha's police report mentions the noises.

residence," and according to Officer Yandel, because "[i]t's protocol in case we had to enter that residence to check the welfare of anybody if we couldn't make contact. It was a pretty significant amount of blood, and we were concerned that maybe somebody was injured inside."

¶9 The officers went to the front door of the residence and knocked on the door. Matalonis "answered the door without a shirt on. He didn't appear to be injured at all, but he appeared to be out of breath." He was not intoxicated but "seemed pretty upset about something." Officer Yandel "noticed there was blood in the foyer on the floor" as well as "blood to the right which led up to a stairwell." Matalonis testified that he had been cleaning up blood when the officers arrived.

¶10 The officers asked Matalonis who lived at the residence and Matalonis responded that he lived alone. The officers told Matalonis about the injured individual they had met and the blood trail leading to the side door of Matalonis's house. Matalonis explained that he had been in a fight with his brother Antony, but that his brother had left. According to Officer Yandel's police report, Matalonis stated, "Yeah, my brother left already. It was just me and my brother fighting. I just had to do what I had to do to defend myself but he's gone now." The officers told Matalonis "that because there was blood in the house, [they] just wanted to make sure that no one else was injured." Matalonis let the officers into the house.[4]

---

[4] See supra note 2.

5

¶11 Once the officers were inside the house, they directed Matalonis to sit on the couch in his living room.[5] The officers did not place Matalonis in handcuffs or tell him that he was under arrest. Officer Yandel did not frisk Matalonis.[6] Officer Ruha then conducted a search of the residence "to make sure that no one else was inside the house or even injured in the house that needed medical attention" while Officer Yandel stayed behind with Matalonis. At no time did Officer Yandel point a weapon at Matalonis.

¶12 Officer Ruha began his search on the lower level of the house, where the officers and Matalonis were located. He

---

[5] Matalonis testified that the officers "told" him to sit on the couch. Officer Yandel initially testified that he "asked" Matalonis to sit on the couch, but on cross-examination agreed that he had "directed" Matalonis to sit on the couch and that the direction was "a direct order." Officer Ruha testified simply that Matalonis sat on the couch and that he "may have been" directed to sit on the couch.

[6] Officer Ruha could not recall whether he had frisked Matalonis. Officer Yandel did not see Officer Ruha frisk Matalonis, and Matalonis did not provide testimony regarding whether Officer Ruha had frisked him. Counsel for Matalonis asked Officer Yandel about the fact that Matalonis was apparently not frisked:

> Q: So you're not worried for officer safety enough to even frisk Mr. Matalonis, correct?
>
> A: We did have officer safety concerns, yes.
>
> Q: But you didn't think enough to even frisk Mr. Matalonis, correct?
>
> A: Correct.

found "a couple drops of blood" in the living room,[7] and then moved into the kitchen where he found "another couple drops of blood."  A bucket of water and a mop were in the kitchen. Officer Ruha went to the basement area but "didn't locate any blood down there."[8]  Officer Ruha returned to the lower level and proceeded up the stairs to the second floor.  On the stairs to the second floor "there [were] what appeared to be droplets of blood on the carpet and blood smeared all along the wall leading upstairs."

¶13  Upstairs, "[t]here appeared to be blood all over the handrail.  There was a mirror that was down that was broken. There [were] shards laying all over the floor."  Officer Ruha moved into a "little living area" to his left, but "didn't locate anyone in there."  He did, however, observe "various pipes and other smoking utensils used for smoking marijuana."

---

[7] Matalonis testified, "There was no blood in the main living room that I know of."

[8] It is unclear from the record whether Officer Ruha in fact entered the basement.  On direct examination Officer Ruha stated, "I actually went down to the basement."  On cross-examination Officer Ruha was asked, "[Y]ou don't go into the basement because there's no blood going down there, correct?" Officer Ruha responded, "Correct."  When rendering judgment the circuit court stated, "The officers only searched where there was blood.  They didn't go in the basement."

At some point a tenant who lived in the basement came out of his room——according to Officer Yandel, "came upstairs"——and spoke with the officers, but the record is not entirely clear regarding at what point during the search of the house this happened.

This included "a small silver grinder that lay opened on the coffee table containing a green leafy substance that [Officer Ruha] identified as marijuana through [his] training and experience." Then he continued right, and "saw that there was a door with a deadbolt that had blood splatters on the door itself."[9] Officer Ruha tried unsuccessfully to open the door, which was locked. He then moved past the door and into a bathroom. There were no individuals in the bathroom, but Officer Ruha saw a "ceramic water bong used for smoking marijuana." Officer Ruha went back to the locked door, where he "could not hear anyone inside, but . . . did smell a strong odor of marijuana coming through [the] door and . . . heard a fan running." Officer Ruha testified that at that point he was

---

[9] On cross-examination counsel for Matalonis, using a photograph of the door, questioned Officer Ruha about the extent of blood on the door.

> Q: And the blood you're speaking about are these two little drops here?
>
> A: Drops here, drops all the way down here.
>
> Q: And that is like the least amount of blood anywhere in that house, is that a fair statement, compared to, let's say, the stairway?
>
> A: That would be fair to say.

In his brief before this court, Matalonis characterizes the blood on the locked door as "two little drops of blood." The State argues that photographs of the door "show a number of spatter marks running across the bottom of the door and on the adjacent wall," and "three red drops forming a triangle between the lock and door handle as well as additional red marks on the adjacent door jamb."

"interested in knowing that there's no one injured behind that door."[10] Since he "realized that [the locked room] was the only place [he] could not get into to check," Officer Ruha went back downstairs to ask Matalonis for the key to the room in order "to ensure that no one is injured behind that door."

¶14 While Officer Ruha was searching the house, Officer Yandel asked Matalonis about the fight he had had with his brother Antony. Matalonis described what had happened. He also mentioned that somebody lived in the basement of the house. At some point in their conversation, Matalonis asked Officer Yandel "if, while they were doing their sweep [of the house], [he] could continue cleaning up the blood from the fight." According to Matalonis, Officer Yandel did not allow him to do so, but instead told Matalonis that he "had to stay right where [he was] and to not get up."[11]

---

[10] Officer Ruha was asked by counsel for Matalonis:

Q: Can you tell me what, objectively, would lead you to believe someone was behind that door?

A: There's droplets of blood around the door handle and it's locked from the inside.

Q: Well, it's not locked from the inside. It's locked from the deadbolt.

A: It's deadbolted. Either you lock it with a key or you lock it from the inside.

[11] Officer Yandel did not remember Matalonis asking him if he could continue cleaning the house, but agreed that he did not allow Matalonis to get up from the couch.

¶15 Officer Ruha returned to the living room. According to Matalonis, Officer Ruha's search took "10 to 15 minutes." Testimony regarding the conversation that followed differed slightly when recounted by Matalonis, Officer Ruha, and Officer Yandel. According to Matalonis, Officer Ruha asked Matalonis what was in the locked room. Matalonis responded that the room was "a security room where I keep my valuables."[12] Officer Ruha then "said he needed to get in the room, and he was going to kick the door down unless [Matalonis] told him where the key was." At some point during the conversation, according to Matalonis, Officer Ruha asked whether there was anyone else in the room or made clear that "[h]e wanted to go and look for bodies in that room."

¶16 According to Officer Yandel, Officer Ruha "asked what was in that room, said that he noticed that there was blood on that door and said that he would have to check that room to make sure no one was injured in there." Officer Yandel then "noticed [Matalonis's] breathing started becoming faster. He looked nervous to me. Officer Ruha told him he was going to kick the door in unless he had a key." At some unspecified point in the conversation Matalonis told the officers the room "was a security room and he had some security equipment in there," that he kept the room locked, and that no one was in the room. Additionally, at some point in the conversation Officer Ruha

---

[12] Matalonis admitted at the suppression hearing that this statement was "obviously" not true.

informed Officer Yandel that he had found drug paraphernalia and marijuana upstairs.[13]

¶17 According to Officer Ruha, upon his return to the living room, "I asked [Matalonis] where the key to the door was. I gave him the options of [sic] I needed to ensure that no one was injured inside [the locked] room. There's blood on the door. Either I need to know where the key's at or I'm going to kick the door in."[14] Matalonis said he would not consent to the officers' entry into the room, and "said it was a security room for his security cameras."

¶18 Matalonis testified that approximately 20 minutes had elapsed between the officers' initial entry into Matalonis's home and the moment that Officer Ruha asked Matalonis for the key to the locked room. The officers obtained the key to the

---

[13] When asked on cross-examination whether Officer Ruha also told Officer Yandel at that time about the smell of marijuana and sound of a fan coming from the inside of the locked room, Officer Yandel stated, "I don't remember that conversation."

[14] Both officers were asked by counsel for Matalonis why they declined to kick down the door immediately without asking Matalonis for a key, given their testimony that they were concerned about possible injured persons inside the room. Both responded to the effect that allowing Matalonis to produce the key would avoid damage to the home.

room[15] after waiting for a certain amount of time.[16] Officer Ruha testified that the key was located next to an aquarium on the second floor, and that there was a bag of marijuana next to the key. Matalonis testified that the key was not hidden and was kept in a red cup on top of the aquarium, "probably five to six feet" away from the locked door.[17]

---

[15] The question of the circumstances under which the officers obtained the key was sharply disputed by the parties at the suppression hearing. Officers Ruha and Yandel testified that Matalonis assisted them in locating the key and told the officers that he had marijuana plants growing in the locked room. Matalonis testified that he provided no assistance in finding the key to the room, that he never consented to their entry into the room, and that he intended to let the officers kick down the door to the room. Matalonis maintained that Officer Ruha went upstairs and found the key to the room on his own. Matalonis also denied making the statement about the presence of marijuana in the locked room. The circuit court concluded, "If I had to resolve that question of fact, I would resolve it in the direction of there was assistance in obtaining the key, especially in light of the fact that, unequivocally, the officers had told [Matalonis] that they were going to kick the door down."

[16] Officer Ruha contended that Matalonis sat for "a matter of seconds" before telling the officers the location of the key. Officer Yandel wrote in his police report that Matalonis paused "for several minutes" when he was asked for the key, but stated at the suppression hearing, "[f]rom my recollection, it was a pause for several seconds." Officer Yandel testified that Matalonis then told Officer Ruha where the key was. Matalonis testified that he "sat there for probably about five minutes" before Officer Ruha left to look for the key.

[17] At the suppression hearing Officer Ruha was presented with a picture of the red cup but could not remember "exactly" if the key had been located in the cup, though he stated "[i]t may have been."

12

¶19 According to Officer Ruha, Officer Ruha went back upstairs,[18] unlocked the locked room, announced "Kenosha Police," and entered the room. "A large marijuana plant was being grown as soon as you opened the door. It was a pretty sophisticated system." No one was present in the room.

¶20 Officer Ruha returned downstairs. Matalonis was still sitting in the living room on the couch. Officer Ruha asked Matalonis about the marijuana. Matalonis "said the plants were his and he didn't wish to talk any further about the plants." Officer Ruha then spoke with him about the fight between him and his brother. Matalonis eventually asked to speak with a lawyer and was arrested later that night. At some point "[a]fter the residence was secured and [the officers] found no one else injured or hurt inside [the] house," the officers attempted to obtain a search warrant but were denied the warrant. Officer Ruha testified that "[w]hatever [evidence] we found in plain view, we took," and that after the search warrant was denied he "didn't open any drawers or go any further into the house and look for anything else."

## II. PROCEDURAL BACKGROUND

¶21 On January 17, 2012, the State filed a criminal complaint against Matalonis, charging him with possession of drug paraphernalia, contrary to Wis. Stat. § 961.573(1) (2011-

---

[18] Officer Ruha testified that he was accompanied by his sergeant, who, according to Officer Ruha and Officer Yandel, had arrived during the conversation with Matalonis and had been briefed on the situation.

13

12),[19] possession of tetrahydrocannabinols ("THC"), contrary to § 961.41(3g)(e), and manufacture or delivery of THC in an amount not more than 200 grams or four plants, contrary to § 961.41(1)(h). On November 28, 2012, Matalonis filed a motion to suppress the evidence seized in the search of his residence as unconstitutionally conducted without a warrant and without consent. On April 4, 2013, a hearing on Matalonis's suppression motion was held in Kenosha County circuit court. The circuit court denied Matalonis's motion. The court concluded in part:

> The search there once inside the house was not directed at finding evidence but for protective search and for injured parties. . . . [The officers] searched only in areas where there was blood found and they didn't search drawers or places where obviously people could not hide but only rooms and larger areas where bodies might be found.
>
> . . .
>
> [T]here was blood on the door. . . . So it was reasonable for them to extend their search for injured parties to that area. Again, with someone who is bleeding, someone who is taken away by ambulance, to have a locked door in a house with blood on that door and not search behind that door and to later find that there's a dead body or a bleeding body or a person in need of medical assistance behind that door I think

---

[19] All subsequent references to the Wisconsin Statutes are to the 2011-12 version unless otherwise indicated.

would not only be improper, it would be a sign of poor police work.[20]

¶22 On May 15, 2013, Matalonis pleaded no contest to the charge of manufacture or delivery of THC in an amount not more than 200 grams or four plants; the two other charges were dismissed and read in for purposes of sentencing. On June 28, 2013, the court withheld sentence and placed Matalonis on probation for 18 months. On January 14, 2014, Matalonis filed a notice of appeal.

¶23 On December 23, 2014, the court of appeals reversed the circuit court's judgment of conviction and order denying Matalonis's motion to suppress, and remanded the case to the circuit court to suppress the evidence resulting from the warrantless search. See State v. Matalonis, No. 2014AP108-CR, unpublished slip op., ¶37 (Wis. Ct. App. Dec. 23, 2014). The court of appeals concluded that the officers were not exercising a bona fide community caretaker function. See id., ¶¶25, 31.

¶24 The court of appeals stated that the police were required to possess, under the totality of the circumstances, "an 'objectively reasonable basis' to believe there [was] 'a member of the public who [was] in need of assistance.'" Id., ¶15 (quoting State v. Ultsch, 2011 WI App 17, ¶15, 331

---

[20] The court based its ruling on multiple grounds, including, apparently, the hot pursuit and emergency aid doctrines. Both before the court of appeals and in its petition for review to this court, the State argued the search at issue should be upheld under the community caretaker and protective sweep doctrines. We do not address any other grounds for upholding the search.

Wis. 2d 242, 793 N.W.2d 505). The court analyzed two cases in which officers were found to be exercising a bona fide community caretaker function, State v. Gracia, 2013 WI 15, 345 Wis. 2d 488, 826 N.W.2d 87, and State v. Pinkard, 2010 WI 81, 327 Wis. 2d 346, 785 N.W.2d 592. It also examined two cases in which officers were found not to be exercising a bona fide community caretaker function, State v. Maddix, 2013 WI App 64, 348 Wis. 2d 179, 831 N.W.2d 778, and State v. Ultsch, 2011 WI App 17, 331 Wis. 2d 242, 793 N.W.2d 505. The court concluded:

> In Pinkard and Gracia, the officers had specific concerns about the welfare of people known to be present in the homes when the officers entered the homes. However, the present case is more similar to Maddix in that the officers in this case did not have before them any evidence pointing "concretely to the possibility that a member of the public was in need of assistance" inside Matalonis's home.

Matalonis, unpublished slip op., ¶24 (quoting State v. Maddix, 2013 WI App 64, ¶27, 348 Wis. 2d 179,831 N.W.2d 778). The court of appeals recognized that there were "conflicting versions of how Matalonis's brother sustained his injuries" but added that "in no version is there reference to any other person being injured." Id. Ultimately, the court decided, "A mere possibility that another person may be injured without any other evidence that concretely points to the possibility that a member of the public required assistance does not meet the more demanding objective reasonable basis standard." Id., ¶25 (citing Ultsch, 331 Wis. 2d 242, ¶15).

16

¶25 The court further held that, assuming the officers were acting as community caretakers, id., ¶31, their exercise of that function was not reasonable because "the public's interest in the intrusion was minimal and . . . did not outweigh the substantial intrusion upon Matalonis's privacy interest in his home." Id., ¶36. In particular, any exigency that existed "diminished significantly once the officers were informed by Matalonis that he had been involved in a fight with his brother and that his brother had left," and "by the time the officers reached the locked door, which at best revealed only very minor streaks of blood on the door's surface and on the doorknob, a reasonable officer would have suspected that Matalonis was the only person in the residence." Id., ¶32. Additionally, "the degree of authority and force displayed by the officers in this case was considerable." Id., ¶33.

¶26 Finally, the court determined that the officers' search did not constitute a lawful protective sweep because "the evidence before the officers did not provide an objectively reasonable basis for the officers to believe their safety was at risk." Id., ¶¶29-30.[21]

¶27 On January 22, 2015, the State filed a petition for review in this court. On April 17, 2015, we granted the petition.

---

[21] Judge Blanchard dissented and would have upheld the search on community caretaker grounds. See State v. Matalonis, No. 2014AP108-CR, unpublished slip op., ¶38 (Wis. Ct. App. Dec. 23, 2014) (Blanchard, P.J., dissenting).

### III. STANDARD OF REVIEW

¶28 When we review an order granting or denying a motion to suppress evidence, we are presented with a question of constitutional fact requiring application of a two-step analysis. State v. Robinson, 2010 WI 80, ¶22, 327 Wis. 2d 302, 786 N.W.2d 463 (citations omitted). "First, we review the circuit court's findings of historical fact under a deferential standard, upholding them unless they are clearly erroneous. Second, we independently apply constitutional principles to those facts." Id. (citations omitted).

### IV. ANALYSIS

¶29 The Fourth Amendment to the United States Constitution and Article I, § 11 of the Wisconsin Constitution prohibit "unreasonable searches and seizures." U.S. Const. amend. IV; Wis. Const. art. 1, § 11. "[W]arrantless searches of homes are presumptively unreasonable." Robinson, 327 Wis. 2d 302, ¶24 (citation omitted). As we have noted, however, "the nature of a police officer's work is multifaceted." State v. Kramer, 2009 WI 14, ¶32, 315 Wis. 2d 414, 759 N.W.2d 598. Put differently,

> Police officers wear many hats: criminal investigator, first aid provider, social worker, crisis intervener, family counselor, youth mentor and peacemaker, to name a few. They are charged with the duty to protect people, not just from criminals, but also from accidents, natural perils and even self-inflicted injuries. We ask them to protect our property from all types of losses——even those occasioned by our own negligence. They counsel our youth. They quell disputes between husband and wife, parent and child, landlord and tenant, merchant and patron and quarreling neighbors. Although they search for clues to solve crime, they also search for missing

18

children, parents, dementia patients, and occasionally even an escaped zoo animal. They are society's problem solvers when no other solution is apparent or available.

Ortiz v. State, 24 So. 3d 596, 607 n.5 (Fla. Dist. Ct. App. 2009) (Torpy, J., concurring and concurring specially).

¶30 We have acknowledged that "a police officer serving as a community caretaker to protect persons and property may be constitutionally permitted to perform warrantless searches and seizures." State v. Pinkard, 2010 WI 81, ¶14, 327 Wis. 2d 346, 785 N.W.2d 592. An officer's community caretaker function is "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." Kramer, 315 Wis. 2d 414, ¶¶19, 23 (quoting Cady v. Dombrowski, 413 U.S. 433, 441 (1973)).[22] That is, an officer's community caretaker function is distinct from the officer's law enforcement function. See Pinkard, 327 Wis. 2d 346, ¶¶18, 31 (citation omitted). In sum, we need not invalidate a warrantless search of a residence if the search was conducted pursuant to a police officer's reasonable exercise of a bona fide community caretaker function. See id., ¶¶28-29.

¶31 Our community caretaker analysis is the same under both the United States and Wisconsin Constitutions. State v. Gracia, 2013 WI 15, ¶14, 345 Wis. 2d 488, 826 N.W.2d 87

---

[22] As we will explain shortly, however, see infra ¶32, an officer engaged in a bona fide community caretaker function might also possess subjective law enforcement concerns. State v. Pinkard, 2010 WI 81, ¶31, 327 Wis. 2d 346, 785 N.W.2d 592.

(citation omitted). As always, "[t]he ultimate standard set forth in the Fourth Amendment is reasonableness." Pinkard, 327 Wis. 2d 346, ¶13 (citing Cady, 413 U.S. at 439). However, we analyze the reasonableness of a residential search alleged to be justified under the community caretaker doctrine using a three-step test:

> (1) whether a search or seizure within the meaning of the Fourth Amendment has occurred; (2) if so, whether the police were exercising a bona fide community caretaker function; and (3) if so, whether the public interest outweighs the intrusion upon the privacy of the individual such that the community caretaker function was reasonably exercised within the context of a home.

Id., ¶29 (footnote omitted) (citation omitted). The State bears the burden of proving that these factors have been met. Id. (citation omitted).

¶32 With regard to the second step,

> When evaluating whether a community caretaker function is bona fide, we examine the totality of the circumstances as they existed at the time of the police conduct. In so doing . . . the "totally divorced" language from Cady does not mean that if the police officer has any subjective law enforcement concerns, he cannot be engaging in a valid community caretaker function. Rather, . . . in a community caretaker context, when under the totality of the circumstances an objectively reasonable basis for the community caretaker function is shown, that determination is not negated by the officer's subjective law enforcement concerns.

Kramer, 315 Wis. 2d 414, ¶30 (citations omitted).

¶33 The third step requires us to "balance the public interest or need that is furthered by the officers' conduct against the degree and nature of the intrusion on the citizen's

20

constitutional interest." Pinkard, 327 Wis. 2d 346, ¶41 (citation omitted). Four considerations are of immediate relevance to this question:

> (1) [T]he degree of the public interest and the exigency of the situation; (2) the attendant circumstances surrounding the search, including time, location, the degree of overt authority and force displayed; (3) whether an automobile is involved; and (4) the availability, feasibility and effectiveness of alternatives to the type of intrusion actually accomplished.

Gracia, 345 Wis. 2d 488, ¶15 (citation omitted).

¶34 The State does not contest that the officers conducted a search of Matalonis's residence, including of the locked room containing the marijuana plants. Therefore, we need only decide whether the officers were exercising a bona fide community caretaker function and doing so in a constitutionally reasonable manner. Because we conclude that the officers in this case reasonably exercised a bona fide community caretaker function when they searched Matalonis's home, we need not determine whether the search was justified as a protective sweep.

### A. Whether the Officers Were Exercising a Bona Fide Community Caretaker Function

¶35 It is obvious to all, in hindsight, that Matalonis's home did not in fact contain a "member of the public . . . in need of assistance." Kramer, 315 Wis. 2d 414, ¶32. But that is not the question before us today. Instead, we must decide whether, "under the circumstances as they existed at the time of the police conduct, [the officers were] engaged in a bona fide community caretaker function." Pinkard, 327 Wis. 2d 346, ¶31

21

(emphasis added) (citation omitted). Therefore, we are concerned with the extent of the officers' knowledge at the time they conducted the search, not after.

¶36 We have no difficulty concluding that the officers in this case were engaged in a bona fide community caretaker function at the time they searched the house and the locked room. The events that unfolded before the officers——when viewed without the benefit of hindsight——are alarming, to say the least.

¶37 The officers, responding to a medical call at almost three in the morning, are confronted with a beaten, bloody, and "highly intoxicated" man, injured to an extent sufficient to justify an ambulance ride to the hospital. The man provides the officers with inconsistent accounts of how many people had injured him, but both accounts feature multiple potential assailants. The officers find blood on a door and a stairway and a "trail" of blood in the snow. At the end of the trail the officers find a residence bearing more blood-stained doors, and hear loud bangs inside the residence. The officers, noting the "pretty significant amount of blood" and fearing potential injured persons inside the residence, call for backup and proceed to knock on the front door of the home.

¶38 Answering the front door is a breathless, shirtless, and "pretty upset" man, Matalonis, who informs the officers that he lives alone and that he had fought with his brother Antony, who has since left. This statement was contrary to information the officers already possessed in three respects. First, Antony

22

had told the officers that he was beaten up by multiple people. Second, Antony had told the officers he sustained his injuries outside of a bar. Third, the officers had been told at the previous residence that Antony lived with his brother. Officer Yandel notices blood on the floor and the stairs.

¶39 At this point, according to the court of appeals, "the exigent nature of the situation," if any, "diminished significantly." Matalonis, unpublished slip op., ¶32. We do not agree with this contention. Instead, the officers now had to make a decision after observing: (1) lots of blood, including some blood in the house before them; (2) an injured person; and (3) inconsistent stories regarding the number of participants in the fight, whether Matalonis lived alone, and exactly what had transpired. The officers requested and obtained entry into Matalonis's house. The officers maintained "that because there was blood in the house, [they] just wanted to make sure that no one else was injured."

1. The Inception of the Search

¶40 After the officers' entry into the home, the search in question began. We ignore, for the time being, the officers' conduct toward Matalonis; this will become relevant at the next step of our analysis. Instead, we ask whether, based on the circumstances at the time, the officers were engaged in a bona fide community caretaker function at the inception of the search.

¶41 We conclude that they were. As the circuit court found——and the circuit court's finding was not clearly

23

erroneous——the officers were not searching for evidence, but for injured parties. See State v. Popke, 2009 WI 37, ¶20, 317 Wis. 2d 118, 765 N.W.2d 569 (under clearly erroneous standard, "we are bound not to upset the trial court's findings of historical or evidentiary fact unless they are contrary to the great weight and clear preponderance of the evidence" (citation omitted)). This is the quintessence of the community caretaker function. See, e.g., Pinkard, 327 Wis. 2d 346, ¶¶14, 34.

¶42 The State has shown "an objectively reasonable basis for the community caretaker function." Kramer, 315 Wis. 2d 414, ¶30. Although the court of appeals stated that "[a] mere possibility that another person may be injured without any other evidence that concretely points to the possibility that a member of the public required assistance does not meet the more demanding objective reasonable basis standard," Matalonis, unpublished slip op., ¶25 (citation omitted), there was "other evidence" in this case: blood inside the house, the loud bangs heard by the officers while they were outside, Antony's statement that multiple other individuals were involved, and Matalonis's assertions to the contrary, which were therefore suspect (as was Antony's account).[23] The officers did not know who to believe or what had happened. At Matalonis's door, the officers were basically told, "Yes, I just beat a drunken man

_____

[23] Matalonis's statements were also suspect because, although the resident at the original address had told the officers that Antony lived with Matalonis, Matalonis told the officers that he lived alone.

24

senseless, but there's nothing to see here; all this blood is his." The officers need not have had their concerns assuaged by Matalonis's explanation.[24]

¶43 The court of appeals apparently relied to some extent on the fact that, in some of our other cases upholding searches under the community caretaker doctrine, namely <u>Pinkard</u> and <u>Gracia</u>, "officers had specific concerns about the welfare of people <u>known to be present in the homes when the officers entered the homes</u>." <u>Matalonis</u>, unpublished slip op., ¶24 (emphasis added). Here, it is true, the officers did not <u>know</u> that there was an injured individual in any of the home's rooms. But the Fourth Amendment does not inflexibly require that officers be concerned about specific, "known" individuals in order to be acting as community caretakers.

¶44 For instance, the case in which the community caretaker doctrine "has its origins," <u>Cady v. Dombrowski</u>, 413 U.S. 433 (1973), involved Wisconsin police taking actions directed toward the welfare of unknown individuals. <u>Pinkard</u>, 327 Wis. 2d 346, ¶15. In <u>Cady</u> a Wisconsin police officer searched the trunk of a vacant car that had been towed to a

---

[24] We recognize that it is possible, and even likely, that the officers in this case were also motivated by the desire to investigate a potential battery. However, "when under the totality of the circumstances an objectively reasonable basis for the community caretaker function is shown, that determination is not negated by the officer's subjective law enforcement concerns." <u>State v. Gracia</u>, 2013 WI 15, ¶19, 345 Wis. 2d 488, 826 N.W.2d 87.

privately-owned garage. Cady v. Dombrowski, 413 U.S. 433, 436-37 (1973). The car belonged to a man who had become drunk, crashed the car, and later identified himself to police as a Chicago police officer. Id. at 435-37. The Wisconsin police officer searched the car "to protect the public from the possibility that [the Chicago police officer's service] revolver would fall into untrained or perhaps malicious hands." Id. at 437, 443. The police did not find a revolver in the car. Id. at 436. The Supreme Court upheld the search. See id. at 446. Cady thus involved (1) a search based on the potential existence of a dangerous object, (2) to protect against the potential that some unknown person might be harmed by the object. See id. at 447.

¶45 In Bies v. State, 76 Wis. 2d 457, 251 N.W.2d 461 (1977), which constituted "our very first discussion of the community caretaker exception to the warrant requirement," Pinkard, 327 Wis. 2d 346, ¶21, an officer responded to information provided by an anonymous telephone caller——information "therefore . . . not possessed of even minimal 'indicia of reliability,'"——that "someone" was "making noise shortly after midnight" in an unspecified garage in an alley. Bies v. State, 76 Wis. 2d 457, 461, 470, 251 N.W.2d 461 (1977). We stated,

> Checking noise complaints bears little in common with investigation of crime. As a general matter it is probably more a part of the "community caretaker" function of the police. . . . The officer was clearly justified in proceeding to the alley in question and conducting a general surveillance of the area to

26

determine whether some noise or other disturbance was present.

Id. at 471.  Bies thus involved an investigation that was only marginally directed at the welfare of an identifiable person, the anonymous caller.

¶46 In a more recent case, Kramer, there was no dispute between the parties that, but for the possibility of certain subjective concerns, an officer was acting in a community caretaker capacity when he activated his police cruiser's emergency overhead lights while pulling up behind a vehicle which was legally parked on the side of the road and which had activated its hazard lights.  Kramer, 315 Wis. 2d 414, ¶¶4-5, 22, 24, 37.  The officer in that case "testified that his reason for stopping was to 'check to see if there actually was a driver, [and to] offer any assistance.'"  Id., ¶5 (emphasis added).  We later acknowledged that the officer did not know "what was going on inside the vehicle, or whether there was a driver present," id., ¶38 (emphasis added), and did so again when we explained that "it was [the officer's] community caretaker function of offering assistance to what could have been a motorist stranded in a stalled vehicle after dark that led to the officer's contact with Kramer."  Id., ¶39 (emphasis added).

¶47 Although the parties in that case were litigating the constitutional implications of the officer's subjective concerns rather than whether the officer's actions constituted community caretaking in the first place, see id., ¶24, the case is

illustrative for our purposes. Requiring an officer such as the one in Kramer to have concern for specific, "known" individuals in order to be acting as a community caretaker might well mean that an officer would have to have some kind of evidence pointing to the presence of specific individuals in a stalled, abandoned, or overturned vehicle on the side of the road before he or she could investigate the vehicle as a community caretaker.

¶48 Kramer suggests, like Cady and Bies, that whether the police are acting in their capacity as community caretakers does not depend upon whether the police are acting to protect persons that have been specifically identified. The reverse is also true: just because the police are acting to protect a person that has been specifically identified does not mean that the police are acting in their capacity as community caretakers. See, e.g., Ultsch, 331 Wis. 2d 242, ¶¶1, 3-4 (police not engaged in community caretaker function when they entered home to locate driver of damaged vehicle after driver's boyfriend informed the officers the driver was "up at the house 'possibly in bed or asleep'"). We cannot lose sight of the fact that the question of the lawfulness of the officers' conduct is ultimately one of

reasonableness. Pinkard, 327 Wis. 2d 346, ¶13 (citation omitted).[25]

¶49 The blood in this case——on the stairwell of the first apartment, in the snow, on the side doors of Matalonis's house, on the floor of the foyer of Matalonis's house, and leading up to the stairwell in Matalonis's house——came from somewhere, obviously, and Antony indicated that multiple individuals were involved in the fight that led to his injuries. Antony initially told Officer Ruha that he had been beaten up by four different groups of people outside of a bar, but later said that he was beaten up by four people outside of a bar. Matalonis, in contrast, told the officers that he and Antony alone had fought. Additionally, the resident at the address to which the officers had first responded told the officers that Antony lived with his

---

[25] The court of appeals below relied upon a formulation of the "objectively reasonable basis" test it had earlier set forth in its Ultsch opinion, namely that "there must have been 'an "objectively reasonable basis" to believe there [was] "a member of the public who [was] in need of assistance."'" Matalonis, unpublished slip op., ¶15 (quoting State v. Ultsch, 2011 WI App 17, ¶15, 331 Wis. 2d 242, 793 N.W.2d 505). This slightly misleading phrasing was created by splicing together two distinct quotations from Kramer. See Ultsch, 331 Wis. 2d 242, ¶15 (quoting State v. Kramer, 2009 WI 14, ¶¶30, 32, 315 Wis. 2d 414, 759 N.W.2d 598). Our original formulation of that test was that there must be "an objectively reasonable basis for the community caretaker function." Kramer, 315 Wis. 2d 414, ¶30 (emphasis added). We also stated in Kramer that an officer "serves as a necessary community caretaker when the officer discovers a member of the public who is in need of assistance." Id., ¶32. This statement should not be read to require certainty as to whether a dangerous situation involves the presence of individuals. As we have explained, Kramer itself arguably implied that that kind of certainty is not required.

brother, but Matalonis told the officers that he lived alone. Officers Ruha and Yandel were apparently concerned that perhaps Matalonis was not telling the truth. They had also heard loud noises coming from inside Matalonis's residence. The evidence in this case sufficiently provides an objectively reasonable <u>basis</u> for the police to believe an injured individual needed their help. We conclude that the officers in this case were engaged in the exercise of a bona fide community caretaker function when they searched Matalonis's home.[26]

---

[26] The court of appeals thought that this case was similar to <u>State v. Maddix</u> "in that the officers in this case did not have before them any evidence pointing 'concretely to the possibility that a member of the public was in need of assistance' inside Matalonis's home," but that case is distinguishable. <u>See</u> <u>Matalonis</u>, unpublished slip op., ¶24. In <u>Maddix</u> evidence pointing to an individual in need of protection included: (1) a call reporting a domestic disturbance, and (2) hearing screams from inside the residence upon the officers' arrival. <u>State v. Maddix</u>, 2013 WI App 64, ¶26, 348 Wis. 2d 179, 831 N.W.2d 778. Once inside the residence, the officers met and separately interviewed two individuals. <u>Id.</u> One of the individuals explained that she had screamed because "she was scared but she didn't know what she was scared of." <u>Id.</u> The <u>Maddix</u> court determined that a subsequent search of the residence did not fall within the scope of the community caretaker function. <u>Id.</u>, ¶25.

The <u>Maddix</u> court noted that the "female's failure to identify the source of the fear that caused her to scream" had been the "primary basis" for the officers' subsequent search of the apartment. <u>Id.</u>, ¶26. Both individuals "gave the same basic account" of what had happened. <u>Id.</u>, ¶29. The court explained that "no evidence directly corroborated the officers' theory that another person was present in the apartment" and that there was no "corroboration that someone was in need of assistance." <u>Id.</u>, ¶¶26-28. During the 25 to 30 minutes that the officers were in the apartment prior to the inception of the search, the officers were presented with "virtually no" relevant evidence

(continued)

30

2. The Search of the House and of the Locked Room

¶50 Given our conclusion that the officers' search of Matalonis's home was an exercise of the community caretaker function, we examine whether the officers were presented with evidence during their search that rendered that function no longer necessary or otherwise negated it. If the officer in Bies had discovered a person loudly playing music in the alley in question, for example, the officer might not have been justified in continuing his search after asking that the music be turned off. See Maddix, 348 Wis. 2d 179, ¶¶29-30 (officers who entered apartment and interviewed occupants "properly exercised their community caretaker function and achieved the purpose for which they were dispatched" and were not justified in also searching the apartment). As we have made clear,

_____

"such as noises, nervous behavior by Maddix or the female, or statements by either of them that implied the presence of another person." Id., ¶28.

In this case, in contrast, the blood trail and significant amounts of blood that the officers discovered supported the officers' theory that an individual in Matalonis's residence was in need of assistance. This theory was "corroborated" by Antony's statement that multiple individuals were involved. In contrast to Maddix, moreover, the parties involved in this case did not "[give] the same basic account." Id., ¶29 Finally, the officers perceived suspicious noises coming from within the residence and were confronted by Matalonis's suspicious behavior: he answered the door breathless and "pretty upset" and offered a version of events that did not match the information the officers had gained earlier. While the Maddix court found "no . . . facts," id., ¶30 (emphasis added), suggesting someone else was present, here there was sufficient evidence supporting the officers' concern that someone was in need of their assistance.

31

Matalonis's explanation was not sufficient for this purpose because, among other things, the officers already possessed contrary information.

¶51 The officers' community caretaking logically would have been fulfilled only after they had checked the areas of the home where persons might be located. The circuit court found that "[the officers] searched only in areas where there was blood found and they didn't search drawers or places where obviously people could not hide but only rooms and larger areas where bodies might be found." This conclusion is not clearly erroneous.

¶52 During his search, Officer Ruha located numerous signs of drug use. This does not invalidate the search. "[W]hen under the totality of the circumstances an objectively reasonable basis for the community caretaker function is shown, that determination is not negated by the officer's subjective law enforcement concerns." Gracia, 345 Wis. 2d 488, ¶19. Police officers do not operate in a vacuum and may be confronted with evidence of criminal activity as they seek to execute tasks that are not related to law enforcement. See Pinkard, 327 Wis. 2d 346, ¶¶18, 40. The fact that there was evidence of drug use in the house was not Officer Ruha's fault, and we find no reason to disturb the circuit court's conclusion that the reason for the search was to check the house for injured parties.

¶53 Similarly, we are convinced that Officer Ruha had the welfare of potentially injured parties in mind when he obtained access to the locked room in question. Upstairs, Officer Ruha

32

had found "blood all over the handrail. There was a mirror that was down that was broken. There [were] shards laying all over the floor." These were further signs of an altercation. Officer Ruha then observed (1) a locked door, (2) with blood on it. If Matalonis had been lying about the presence of injured parties, the room was obviously a likely candidate for concealment of those parties. When Matalonis was questioned about the door, Officer Yandel "noticed [Matalonis's] breathing started becoming faster. [Matalonis] looked nervous to" Officer Yandel. At that time the officers clearly had not yet completed their legitimate community caretaking function. The circuit court put it well:

> [W]ith someone who is bleeding, someone who is taken away by ambulance, to have a locked door in a house with blood on that door and not search behind that door and to later find that there's a dead body or a bleeding body or a person in need of medical assistance behind that door I think would not only be improper, it would be a sign of poor police work.

¶54 Again, we recognize that the officers may have had other subjective, enforcement-related interests at this time. In particular, Officer Ruha testified that he heard a running fan behind the locked door and smelled marijuana. If these two facts were the only relevant ones before Officer Ruha, a warrantless entry might not have been justified. But in light of all the facts that Officer Ruha had to consider——the blood (outside the house, inside the house, and on the door itself), the fact that the door was locked, the conflicting stories, and the noises the officers had heard——Officer Ruha's testimony that

33

he heard a fan inside the locked room and smelled marijuana does not negate the officers' bona fide community caretaking function. See Gracia, 345 Wis. 2d 488, ¶19. The potential for the presence of marijuana in the locked room did not render it impossible that there were also injured parties in that room.[27]

¶55 It is easy, after the fact, to say that there was not an injured person behind the locked door. But the police officers in this case had to rely solely on the facts they possessed at the time. Had there been a bludgeoned, bleeding person suffering inside that locked room and had law enforcement not investigated, we would be wondering why not, considering the facts before them. Simply stated, we expect law enforcement to respond to exigent situations, and that is just what they did in this case.

---

[27] Counsel for Matalonis found significant the fact that Officer Ruha asked Matalonis "what" was in the locked room, as opposed to "who" was in the locked room. We do not ascribe the same significance to Officer Ruha's choice of words. First, we do not think it prudent to imbue a single word with so much consequence, especially given that events on the night in question unfolded rapidly. Second, had there actually been injured persons in the locked room, Matalonis would have been actively concealing those persons from the police, and would therefore not necessarily be expected to freely admit to doing so in response to a question about the contents of the room. For all we know, Officer Ruha framed the question the way he did in order to gauge Matalonis's reaction, or to appear less concerned than he actually was so as to keep Matalonis's guard down. There is not enough evidence in the record to ascertain the reason for Officer Ruha's particular phrasing of the question.

¶56 We conclude that the officers were exercising a bona fide community caretaker function when they searched Matalonis's home for injured parties. This function continued for the duration of Officer Ruha's search of the home, including of the locked room.

### B. Whether the Officers Exercised their Community Caretaker Function Reasonably

¶57 All that has been determined thus far, from a constitutional perspective, is that a search of Matalonis's house occurred, and that the officers conducted that search in good faith as community caretakers in order to locate injured parties.

¶58 The State still retains the burden, however, of showing that the officers exercised their community caretaker function reasonably. We must "balance the public interest or need that is furthered by the officers' conduct against the degree and nature of the intrusion on the citizen's constitutional interest," Pinkard, 327 Wis. 2d 346, ¶41 (citation omitted), and consider:

> (1) [T]he degree of the public interest and the exigency of the situation; (2) the attendant circumstances surrounding the search, including time, location, the degree of overt authority and force displayed; (3) whether an automobile is involved; and (4) the availability, feasibility and effectiveness of alternatives to the type of intrusion actually accomplished.

Gracia, 345 Wis. 2d 488, ¶15 (citation omitted). We conclude that the officers in this case exercised their community caretaker function reasonably. Although the nature of the

35

officers' intrusion was substantial, the public interest to be served by the intrusion was also substantial, and the nature of the intrusion was strictly limited to the requirements of the situation.

¶59 The public has a significant interest in ensuring the safety of a home's occupants when officers cannot ascertain the occupants' physical condition and reasonably conclude that assistance is needed. Pinkard, 327 Wis. 2d 346, ¶¶45-48 (citing State v. Ziedonis, 2005 WI App 249, ¶29, 287 Wis. 2d 831, 707 N.W.2d 565). Here, Officer Ruha and Officer Yandel reasonably concluded based on the evidence before them that their assistance was needed to verify that the blood in Matalonis's house did not belong to an injured person other than Antony. The situation was exigent in nature. The officers were not responding to a mere noise complaint, such as occurred in Bies, but instead investigating the possibility that a person lay injured, perhaps critically, in Matalonis's home. If the blood in the house belonged to someone besides Antony who "had been seriously injured[,] . . . quick medical assistance would have been necessary." Gracia, 345 Wis. 2d 488, ¶25 (applying first

factor of balancing test to situation involving individual who potentially had been injured in a car accident).[28]

¶60 The attendant circumstances surrounding the search demonstrate the reasonableness of the search, given the circumstances.  Before we analyze this factor, we emphasize the fact that we are not here presented with a police officer's warrantless, nonconsensual entry into a home.  Instead, we examine whether the officers in this case, while already lawfully in Matalonis's home, acted reasonably in searching the rooms of the home without consent.  Nevertheless, the police undeniably intruded on Matalonis's significant constitutional right "to retreat into his own home and there be free from unreasonable governmental intrusion."  Silverman v. United

---

[28] Matalonis argues that if the police had actually believed the situation was urgent, they would have immediately kicked down the door to the locked room without going to the trouble of obtaining the key from Matalonis.  We are not convinced by this argument.  The decisive issue before us is whether the conduct of the police while at Matalonis's residence was reasonable, see Pinkard, 327 Wis. 2d 346, ¶13, and the police must similarly ensure that they are acting reasonably as situations before them progress.  If the police had immediately broken down the door without asking for a key, Matalonis would likely be arguing that "the degree of overt authority and force displayed" was unreasonable.  Gracia, 345 Wis. 2d 488, ¶15 (citation omitted).  Because our analysis of whether the officers exercised the community caretaking function reasonably is a balancing test, we are concerned with the officers' conduct as a whole.  A quick detour to attempt to obtain a key to the locked room (as well as to ask Matalonis about the room) in order to avoid having to kick down a door in Matalonis's house does not prove that the situation was something less than exigent.

States, 365 U.S. 505, 511 (1961) (citation omitted); see Payton v. New York, 445 U.S. 573, 586-87, 589-90 (1980).

¶61 The officers did not choose the time or location of the search because they were initially responding to a medical call and reacting to evidence discovered upon their arrival. See Pinkard, 327 Wis. 2d 346, ¶49 (officers did not control time of day or location because they were responding to an anonymous tip). As for the search itself, as we have noted, the circuit court found "[the officers] searched only in areas where there was blood found and they didn't search drawers or places where obviously people could not hide but only rooms and larger areas where bodies might be found. "

¶62 We agree with the court of appeals that the degree of authority and force the officers displayed was "considerable": "Officer Ruha conducted a warrantless search of Matalonis's residence without Matalonis's consent, . . . Matalonis was detained in his living room with Officer Yandel, and Officer Ruha threatened to break down the locked door on the second floor if a key to the door was not provided." Matalonis, unpublished slip op., ¶33. However, the authority and force displayed was appropriate for the legitimate community caretaking objective the officers were pursuing. In order to ensure that there were no injured parties in Matalonis's house, Officer Ruha needed to check the rooms of the house, and quickly. Obtaining a warrant was not practicable given the exigency of the situation. Further, and for the same reason, the officers needed to obtain immediate access to the locked

38

room. In asking Matalonis for a key to the room rather than abruptly breaking it down, Officer Ruha was attempting to use less authority and force than might have been justified under the circumstances. See Pinkard, 327 Wis. 2d 346, ¶¶50-51 (citing State v. Horngren, 2000 WI App 177, ¶17, 238 Wis. 2d 347, 617 N.W.2d 508) (exigency of situation rendered officers' actions reasonable). Matalonis was detained on the living room couch in his own home while Officer Ruha checked the rooms of the home. However, Matalonis was not handcuffed. He was not placed under arrest. There is no evidence in the record that Matalonis was frisked. There is no evidence in the record that a weapon was ever pointed at Matalonis. All in all, the force and authority displayed in this situation was "considerable" but appropriately tailored to the needs of the situation. See id., ¶55 ("The officers' search was limited to minimize the intrusion into Pinkard's home.").

¶63 No automobile was involved in this case. "This is not a relevant factor here except to recognize that one has a heightened privacy interest in preventing intrusions into one's home." Pinkard, 327 Wis. 2d 346, ¶56.

¶64 Finally, we consider the "availability, feasibility and effectiveness of alternatives to the type of intrusion actually accomplished." Gracia, 345 Wis. 2d 488, ¶15 (citation omitted). As we have said, a warrant was not a feasible alternative. The court of appeals below thought the officers could have "ask[ed] Matalonis whether there was anyone injured (or uninjured) in his home." Matalonis, unpublished slip op.,

39

¶35. We note that the officers asked Matalonis who lived at his residence and Matalonis told the officers that he lived alone.[29] Officer Ruha also asked Matalonis about the contents of the locked room (and was lied to). Given their time constraints, and the fact that the officers "would not have been required to accept at face value" Matalonis's responses, id. (citation omitted), further questioning was not clearly an effective alternative to the route actually taken by the officers. It is difficult to second-guess credibility determinations invariably made by the officers on the night in question.

¶65 The one additional step not taken by Officer Ruha that he could have taken was to knock on the locked door and call out to potential parties on the other side of the door. However, had there been no answer, the officers would have had the same cause for concern. An injured party on the other side of the door could be unconscious, incapacitated, or dead. Though available and feasible, the alternative would not, ultimately, have been effective; Officer Ruha's failure to knock on the locked door only marginally reduces the reasonableness of his actions, if at all.[30]

---

[29] As has been explained, this statement by Matalonis was inconsistent with information the officers had received at the first address to which they had responded.

[30] Counsel for Matalonis found Officer Ruha's failure to knock on the door to the locked room probative. But Officer Ruha's failure to knock on the door is not enough, standing alone, to disturb the circuit court's finding that the officers were in fact searching for injured parties. We do not possess sufficient information regarding Officer Ruha's thought process

(continued)

¶66 Taken together, our balancing test shows: (1) a significant public interest and an exigent situation; (2) a significant intrusion on Matalonis's constitutional rights, but one tailored to the needs of the situation; and (3) few or no available, feasible, and effective alternatives.  We conclude that, on balance, the officers' exercise of the community caretaker function was reasonable "because the public interest in the search outweighed [Matalonis's] privacy interests." Gracia, 345 Wis. 2d 488, ¶30.

V. CONCLUSION

¶67 We conclude that the officers in this case reasonably exercised a bona fide community caretaker function when they searched Matalonis's home.  The officers therefore were not required to obtain a warrant prior to conducting the search in question, and the evidence of marijuana production they obtained should not be suppressed.[31]  Because the search was lawful under

in the face of a developing situation to decide that asking Matalonis for access to the locked room rather than pounding on the door demonstrates that Officer Ruha was unconcerned about injured parties.  And on the other side of the ledger, although Officer Ruha did not knock on the door to the locked room, he testified that he announced "Kenosha Police" as he entered the locked room.  This would tend to show that Officer Ruha believed there might have been individuals in the room.

[31] The State contends, and we agree, that if the officers' search was justified as a reasonable exercise of a bona fide community caretaker function, the officers "acted within the scope of the plain view doctrine when they seized contraband from the residence, including the locked room."  See Pinkard, 327 Wis. 2d 346, ¶62; Gracia, 345 Wis. 2d 488, ¶29 n.14 (explaining plain view exception to the warrant requirement).

the community caretaker doctrine, we need not determine whether the search was also justified as a protective sweep. We reverse the decision of the court of appeals and remand the case to the circuit court for further proceedings consistent with this opinion.

*By the Court.*—The decision of the court of appeals is reversed, and the cause is remanded to the circuit court for further proceedings consistent with this opinion.

¶68 SHIRLEY S. ABRAHAMSON, J. *(dissenting).* I agree with Justice David T. Prosser that the community caretaker exception is important but cannot be interpreted so broadly as to swallow the Fourth Amendment. See, e.g., State v. Gracia, 2013 WI 15, ¶¶42-46, 345 Wis. 2d 488, 826 N.W.2d 87 (Abrahamson, C.J., dissenting, joined by Ann Walsh Bradley, J. & Prosser, J.); Gracia, 345 Wis. 2d 488, ¶¶47-90 (Prosser, J., dissenting, joined by Abrahamson, C.J. & Ann Walsh Bradley, J.); State v. Pinkard, 2010 WI 81, ¶¶64-101, 327 Wis. 2d 346, 785 N.W.2d 592 (Ann Walsh Bradley, J., dissenting, joined by Abrahamson, C.J. & Prosser, J.). Accordingly, I join Justice Prosser's dissent.

¶69 I write separately not only to reaffirm my assessment that this court has taken too broad a view of the community caretaker exception, but also to memorialize once again the approach being taken in the instant case and in other cases argued and tentatively decided before a new justice's (here Justice Rebecca G. Bradley's) appointment to the court, and to compare the practice at this time with past practice in this court and in the United States Supreme Court.

¶70 As I have written previously, these cases "pose[] the question of how a case should be treated by the court when the case was heard and decided before a new justice became a member of the court and the new member joins the court before an opinion is released." New Richmond News v. City of New Richmond, 2015 WI 106, ¶7, 365 Wis. 2d 610, ___ N.W.2d ___ (Abrahamson, J., concurring).

1

¶71 Let me briefly set forth the facts and circumstances of the change in membership of the court, the status of cases heard in September and October, and the issues raised by a new justice's joining the court at this time.[1]

¶72 Justice N. Patrick Crooks passed away on September 21, 2015. Justice Rebecca G. Bradley joined the court on October 9, 2015.

¶73 Prior to September 21, 2015, the court heard oral argument in the instant case and eight other cases. Justice N. Patrick Crooks participated in these nine cases. No opinion was released in these nine cases prior to Justice Rebecca G. Bradley's joining the court. These nine cases are set forth in the attached oral argument schedule (Attachment A) released by the Clerk of the Supreme Court.

¶74 In addition, after Justice N. Patrick Crooks passed away on September 21, 2015, and prior to Justice Rebecca G. Bradley's appointment, the court heard oral argument in seven cases on September 22, October 5, and October 6, 2015. No opinion was released in these seven cases prior to Justice Rebecca G. Bradley's appointment to the court. These seven cases are set forth in the attached oral argument schedules

---

[1] I am not writing about the Office of Lawyer Regulation lawyer discipline cases and petitions for review or bypass and certifications by the court of appeals. These matters are too numerous and involve a large variety of factual patterns. They do, however, present issues similar to those presented by the oral argument cases.

(Attachments A and B) released by the Clerk of the Supreme Court.

¶75 Opinions have been released in five cases heard and decided before Justice Rebecca G. Bradley joined the court. Justice Rebecca G. Bradley did not participate in these five cases: State v. Dumstrey, 2016 WI 3, ¶52, ___ Wis. 2d ___, ___ N.W.2d ___; Winnebago Cnty. v. Christopher S., 2016 WI 1, ¶58, ___ Wis. 2d ___, ___ N.W.2d ___; Wis. DOJ v. Wis. DWD, 2015 WI 114, ¶60, 365 Wis. 2d 694, ___ N.W.2d ___; New Richmond News, 2015 WI 106, ¶4, 365 Wis. 2d 610, ___ N.W.2d ___; State v. Iverson, 2015 WI 101, ¶62, 365 Wis. 2d 302, 871 N.W.2d 661.

¶76 The per curiam opinion in New Richmond News explained Justice Rebecca G. Bradley's non-participation thusly: "Justice Rebecca G. Bradley was appointed to the court after the court's decision, and therefore did not participate."[2] No other opinion has explained Justice Rebecca G. Bradley's non-participation.

¶77 The same situation as described in New Richmond News appears to exist in the instant case. Justice Rebecca G. Bradley was appointed to the court after the court heard oral argument and tentatively decided the instant case on September 18, 2015. Yet unlike New Richmond News and the four other cases from September and October in which opinions have been issued (in which Justice Rebecca G. Bradley did not participate), Justice Rebecca G. Bradley participates in the instant case.

---

[2] New Richmond News, 365 Wis. 2d 610, ¶1.

3

¶78 Although the majority opinion looks regular in its form, the opinion differs from other opinions released in September and October cases. The vote in the instant case is 4-3, with Justice Rebecca G. Bradley as part of the majority of four. Without Justice Rebecca G. Bradley's vote, this case would result in a tie vote. The decision of the court of appeals would be affirmed. With Justice Rebecca G. Bradley's vote, the decision of the court of appeals is reversed.

¶79 In sum, Justice Rebecca G. Bradley's participation in the instant case appears inconsistent with her non-participation in New Richmond News and other cases argued in September and October.

¶80 Although this court has not had much experience with a new justice joining the court after a case has been heard but before an opinion is released, we have had some. In my concurring opinion in New Richmond News, I wrote at length, reviewing this court's past experiences and the past experiences and practice of the United States Supreme Court.[3]

¶81 I concluded that the process when a new justice joins the court after a case has been heard but before an opinion is released is as follows: The justices who originally participated in the case, without the new justice's input, decide whether to reargue the case. The new justice may

---

[3] See New Richmond News, 365 Wis. 2d 610, ¶¶17-25 (Abrahamson, J., concurring).

4

participate in reargument and subsequent proceedings.[4] No precedent appears to exist in the United States Supreme Court or in this court for a new justice who did not participate in oral argument to participate in the case without reargument.

¶82 In the instant case, which predates Justice Rebecca G. Bradley's appointment to the court, Justice Rebecca G. Bradley participates without a reargument. Justice Rebecca G. Bradley's participation in some (but not all) cases predating her appointment to the court, and participation in those cases without a reargument appear to be internally inconsistent and inconsistent with the court's prior practice and the practices in the United States Supreme Court.

¶83 As I stated previously, to aid the court in the future, I write once again to memorialize the approach being taken by the court in the instant case and to compare the present practice with this court's past practice and the practices of the United States Supreme Court.

¶84 For the reasons set forth, I join Justice David T. Prosser's dissent and write separately.

---

[4] Thus, "under past precedent of this court and the United States Supreme Court, it appears that if a new justice is available to break a tie vote, then the court, without the new justice's input, decides whether to reargue the case. In reargument, the new justice participates." See New Richmond News, 365 Wis. 2d 610, ¶¶21-26 (Abrahamson, J., concurring) (citing Buse v. Smith, 74 Wis. 2d 550, 247 N.W.2d 141 (1976); Stephen M. Shapiro et al., Supreme Court Practice, ch. 15.6 at 838-39 (10th ed. 2013)).

ATTACHMENT A

## WISCONSIN SUPREME COURT

### Assignment for the Month of September 2015

## IMPORTANT NOTICE: September 17, 2015 oral arguments will be held at the Grant County Courthouse, 130 W. Maple Street, Lancaster, Wisconsin.

Pursuant to Rule 809.22, you are hereby notified that the following cases will be called for argument on the days stated. The calendar indicates that you are involved in one or more of the cases. Please be present and prepared to argue at the time shown, which is the earliest hour at which your case may be called. Unless otherwise indicated, 30 minutes per side will be allowed for oral argument. An oral argument information sheet is attached for your reference.

### TUESDAY, SEPTEMBER 8, 2015 (in MADISON)

| | | |
|---|---|---|
| 09:45 a.m. - | #14AP515-FT | - State v. Daniel S. Iverson |
| - | #12AP2520 | - Hoffer Properties, LLC v. State of Wisconsin |
| 01:30 p.m. - | #13AP857-CR | - State v. Brett W. Dumstrey |

### THURSDAY, SEPTEMBER 17, 2015 (in LANCASTER)

| | | |
|---|---|---|
| 09:30 a.m. - | #13AP2433-CR | - State v. Stephen LeMere |
| 11:00 a.m. - | #13AP907 | - Kenneth C. Burgraff, Sr. v. Menard, Inc. |
| 02:00 p.m. - | #14AP2431 | - St. Croix County Department of Health and Human Services v. Michael D. |

### FRIDAY, SEPTEMBER 18, 2015 (in MADISON)

| | | |
|---|---|---|
| 09:45 a.m. - | #14AP1048 | - Winnebago County v. Christopher S. |
| - | #14AP1938 | - New Richmond News v. City of New Richmond |
| 01:30 p.m. - | #14AP108-CR | - State v. Charles V. Matalonis |

### TUESDAY, SEPTEMBER 22, 2015 (in MADISON)

| | | |
|---|---|---|
| 09:45 a.m. - | #13AP613/687 | - Wisconsin Pharmacal Company, LLC v. Nebraska Cultures of California, Inc. |

**PLEASE NOTE:** Attorneys on all assigned cases should submit additional authorities that have been reported, issued, or published since the filing of briefs, and which the court should consider. Such letters should be furnished in nine copies with an additional copy to each opposing attorney. See Wis. Stat. § 809.19(10).

Stipulations for continuance will be considered only if they state reasons that are considered by the court to constitute good cause. A copy of the court's rescheduling policy is attached.

**If any special access, visual or hearing arrangements are necessary for your attendance in court, please advise the Clerk's Office at least five (5) days prior to your argument.**

On arrival for argument in **Madison**, please check in with the Clerk's Office Staff outside the courtroom located on the 2nd **Floor, East Wing of the State Capitol.** On arrival for argument in **Lancaster (for cases to be heard on September 17, 2015)**, please check in with the Clerk's Office Staff outside the **assigned courtroom of the Grant County Courthouse.**

**ON ORAL ARGUMENT CASES, PLEASE SIGN AND RETURN THE ENCLOSED SELF-ADDRESSED, STAMPED ACKNOWLEDGMENT POSTCARD THAT ONLY ACKNOWLEDGES THAT YOU HAVE RECEIVED A COPY OF THIS CALENDAR.**

DIANE M. FREMGEN
Clerk of Supreme Court

July 8, 2015; rev. July 9, 2015; rev. July 10, 2015; rev. July 14, 2015; rev. July 30, 2015

1

# ATTACHMENT B

## WISCONSIN SUPREME COURT

### Assignment for the Month of October 2015

Pursuant to Rule 809.22, you are hereby notified that the following cases will be called for argument on the days stated. The calendar indicates that you are involved in one or more of the cases. Please be present and prepared to argue at the time shown, which is the earliest hour at which your case may be called. Unless otherwise indicated, 30 minutes per side will be allowed for oral argument. An oral argument information sheet is attached for your reference.

### MONDAY, OCTOBER 5, 2015

| 09:45 a.m. | - | #14AP1267-CR | - | State v. Andy J. Parisi |
| | | #14AP1880 | - | United Food v. Hormel Foods Corporation |
| 01:30 p.m. | - | #13AP1488 | - | Wisconsin Department of Justice v. Wisconsin Department of Workforce Development |

### TUESDAY, OCTOBER 6, 2015

| 09:45 a.m. | - | #14AP678/679/680 | - | State v. Melisa Valadez |
| | | #14AP1283 | - | S. A. M. v. Nancy M. Meister |
| 01:30 p.m. | - | #13AP1228-CR | - | State v. Jimmie Lee Smith |

### MONDAY, OCTOBER 12, 2015

| 09:45 a.m. | - | #14AP482-D | - | Office of Lawyer Regulation v. Gerald P. Boyle |
| | | #11AP2680-CR | - | State v. Patrick J. Lynch |

**PLEASE NOTE:** Attorneys on all assigned cases should submit additional authorities that have been reported, issued, or published since the filing of briefs, and which the court should consider. Such letters should be furnished in nine copies with an additional copy to each opposing attorney. See Wis. Stat. § 809.19(10).

Stipulations for continuance will be considered only if they state reasons that are considered by the court to constitute good cause. A copy of the court's rescheduling policy is attached.

**If any special access, visual or hearing arrangements are necessary for your attendance in court, please advise the Clerk's Office at least five (5) days prior to your argument.**

On arrival for argument, please check in with the Clerk's Office Staff outside the courtroom located on the 2nd **Floor, East Wing of the State Capitol.**

**ON ORAL ARGUMENT CASES, PLEASE SIGN AND RETURN THE ENCLOSED SELF-ADDRESSED, STAMPED ACKNOWLEDGMENT POSTCARD THAT ONLY ACKNOWLEDGES THAT YOU HAVE RECEIVED A COPY OF THIS CALENDAR.**

DIANE M. FREMGEN
Clerk of Supreme Court

**July 10, 2015; rev. July 14, 2015; rev. October 2, 2015**

¶85 DAVID T. PROSSER, J. *(dissenting).* The Fourth Amendment to the United States Constitution reads as follows:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

¶86 There are exceptions to the Fourth Amendment's warrant requirement, but these exceptions are "few in number and carefully delineated." United States v. U.S. Dist. Court, 407 U.S. 297, 318 (1972). In cases in which the police have seized evidence that a defendant seeks to suppress, a court must determine whether the police conducted a search and, if so, whether they were required to obtain a judicial warrant before the search. No warrant is required when the police are acting pursuant to a recognized exception to the warrant requirement.

¶87 Whether an exception to the warrant requirement exists in a particular case is often a close question. When a court consistently resolves these close questions against the necessity for a warrant, the court tends to expand the exceptions and reduce the protections of the Fourth Amendment. Because I believe the scope of the community caretaker exception is being substantially expanded in this case, without any compelling justification, I respectfully dissent.

I

¶88 The facts in this case are carefully set out by the majority opinion. See majority op., ¶¶4-20. Summarizing

1

briefly, Kenosha police were called to assist a man who was bleeding profusely. The man, Antony Matalonis (Antony), told inconsistent stories about how he was beaten before he was taken to a hospital. Advised that Antony lived with his brother nearby, the police were able to follow a trail of blood to the home of the brother, Charles Matalonis (Charles), a relatively short distance away.

¶89 There was blood on the door of Charles's house. After calling for backup, the police knocked on his door and were quickly admitted. There were splotches of blood throughout the first and second floors. Charles admitted he had been in a fight with his brother. He admitted he had been cleaning up blood. He permitted officers to go through the house to assure their own safety and explore the possibility of other injured persons in the house. They found no injured persons.

¶90 On the second floor, in plain view, a police officer did see marijuana and a variety of drug paraphernalia——pipes and other smoking utensils, a small silver grinder, and a ceramic water bong. The officer also encountered a locked door with a few droplets of blood scattered on the door. The officer smelled a strong odor of marijuana coming through the door and heard a fan running behind the door.

¶91 The date was January 15; the time was after 3:00 a.m. A reasonable person could infer that a fan is not normally operating at such a date and time merely for purposes of comfortable climate control.

¶92 In my view, the officer's observations on the second floor, followed by Charles's refusal to give consent to open the locked door, provided ample probable cause for a search warrant for the locked room to search for drugs. Conversely, the officers would have been hard pressed to make a case for a search warrant to find a body in some condition behind the door. Officers had already accounted for other known occupants of the house, including a basement tenant.

II

¶93 If one acknowledges that there was no probable cause to search for a person——living or dead——behind the door, the government had to have an exception to the warrant requirement that did not require probable cause.

¶94 Consent to search is an exception to the warrant requirement, but everyone understands that threats and duress are inconsistent with voluntary consent. There is no claim in this case that Charles Matalonis freely consented to the search of the locked room.

¶95 The exigent circumstances exception also is inappropriate because the exigent circumstances exception requires probable cause.

¶96 Thus, the State and the majority rely upon the community caretaker exception. This exception does not require probable cause because investigation of a crime is not the predominant motivation for police action.

¶97 In State v. Gracia, 2013 WI 15, 345 Wis. 2d 488, 826 N.W.2d 87, I traced the history and evolution of the community

3

caretaker exception in Wisconsin. My dissent did not discuss the court of appeals' decision in State v. Ziedonis, 2005 WI App 249, 287 Wis. 2d 831, 707 N.W.2d 565, which is a very persuasive analysis of the community caretaker exception.

¶98 There is no need here to restate the analysis in all past cases. It is enough to note that community caretaking has moved beyond fact situations involving automobiles to fact situations inside people's houses and even situations involving locked rooms inside people's homes. Moreover, community caretaking has moved from fact situations in which the actions of police are "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute," State v. Anderson, 142 Wis. 2d 162, 166, 417 N.W.2d 411 (Ct. App. 1987) (quoting Cady v. Dombrowski, 413 U.S. 433, 441 (1973)), rev'd on other grounds, 155 Wis. 2d 77, 454 N.W.2d 763 (1990), and, more than three decades later, fact situations in which a police officer's subjective law enforcement concerns do not negate an "objectively reasonable basis" for the officer's community caretaker function, State v. Kramer, 2009 WI 14, ¶¶29-32, 315 Wis. 2d 414, 759 N.W.2d 598, to situations in which a community caretaking theory supported by corroborating facts does not require a warrant even where traditional law enforcement concerns predominate.

## III

¶99 As the majority properly states, majority op., ¶31, this court uses a three-part test when evaluating whether a law

4

enforcement officer's performance of a community caretaker function provides an exception to the warrant requirement:

> When a community caretaker function is asserted as the basis for a home entry, the circuit court must determine: (1) whether a search or seizure within the meaning of the Fourth Amendment has occurred; (2) if so, whether the police were exercising a bona fide community caretaker function; and (3) if so, whether the public interest outweighs the intrusion upon the privacy of the individual such that the community caretaker function was reasonably exercised within the context of a home.

State v. Pinkard, 2010 WI 81, ¶29, 327 Wis. 2d 346, 785 N.W.2d 592 (citing Kramer, 315 Wis. 2d 414, ¶21).

¶100 This dissent focuses on the second and third prongs stated above.

A

¶101 The majority concludes that Officer Brian Ruha exercised a bona fide community caretaker function because he had an objectively reasonable basis to enter the locked room based on his observations. Majority op., ¶42. However, the majority opinion is unclear on what degree of certainty an officer must possess to initiate the community caretaker function and then to maintain it as circumstances change.

¶102 In State v. Ferguson, 2001 WI App 102, ¶22, 244 Wis. 2d 17, 629 N.W.2d 788, Judge Curley, joined by Judge Fine, used a felicitous phrase: "Unlike the facts in [State v.] Dull[, 211 Wis. 2d 652, 565 N.W.2d 575 (Ct. App. 1997)], the police here never stepped out of their caretaking role." (Emphasis added.) How do we determine when a police officer steps out of

5

his "caretaking role" to focus on the investigation of criminal activity?

¶103 <u>Cady v. Dombrowski</u> and <u>Bies v. State</u>, 76 Wis. 2d 457, 251 N.W.2d 461 (1977), were cases in which officers were not seeking evidence of specific crimes. They were pursuing the non-criminal facet of police work and were surprised at the evidence of criminal activity that they encountered. Both cases are distinguishable from Matalonis's situation.

¶104 From the outset in this case, after seeing Antony, the police thought that a crime might have been committed. If a crime had been committed, there might have been other victims. However, this "theory" was pursued to extreme lengths when an officer postulated that a deceased or injured person might be found behind a locked door, knowing that marijuana would almost certainly be found beyond the locked door.

¶105 The majority declares: "In this case, . . . the blood trail and significant amounts of blood that the officers discovered supported the officers' theory that an individual in Matalonis's residence was in need of assistance. . . . [H]ere there was sufficient evidence supporting the officers' concern that someone was in need of their assistance." Majority op., ¶49 n.26.

¶106 This expansive conception of community caretaking transforms community caretaking from a narrow exception into a powerful investigatory tool. No longer limited to the purpose of allowing the State to rely upon evidence obtained by law enforcement officers incidental to their provision of valuable

6

services to the public, community caretaking becomes an end in itself. Officers can now easily conduct a warrantless search in the name of "community caretaking"; they must merely articulate a hypothetical community need——here, checking to see whether an injured person was trapped in the closet——based on circumstances that they observe. Conveniently, they may then retain any evidence of criminal activity that comes into their plain view as they conduct their community caretaking search.

B

¶107 A broad statement of a bona fide community caretaker function becomes more concerning when considered in conjunction with the public interest that the majority articulates in this case: "The public has a significant interest in ensuring the safety of a home's occupants when officers cannot ascertain the occupants' physical condition and reasonably conclude that assistance is needed." Majority op., ¶59.

¶108 For this proposition, the majority cites Pinkard and Ziedonis. The Pinkard court characterized Ziedonis as involving "a significant public interest in ensuring the safety of the occupants because the officers could not ascertain their physical condition and 'reasonably concluded' that assistance was needed." Pinkard, 327 Wis. 2d 346, ¶45 (quoting Ziedonis, 287 Wis. 2d 831, ¶29). Like Pinkard, Ziedonis involved police officers entering a residence for the purpose of checking the welfare of a resident. Pinkard, 327 Wis. 2d 346, ¶4; Ziedonis, 287 Wis. 2d 831, ¶5. In both cases, officers received information indicating that a person was present in the

7

residence, found a door ajar allowing access to the interior of the residence, announced themselves before searching the residence, and ultimately encountered the resident inside. Pinkard, 327 Wis. 2d 346, ¶¶2-5; Ziedonis, 287 Wis. 2d 831, ¶¶2-8.

¶109 Unlike the residents in Pinkard and Ziedonis, Matalonis responded immediately when law enforcement officers knocked on his door. Matalonis told the officers that he lived alone, and they confirmed the safety of Matalonis's tenant without accessing the locked room.[1] Consequently, with Matalonis, his brother, and his tenant accounted for, Officer Ruha searched the house not for a particular person suspected of needing care but to determine whether any other person was present.

¶110 An open-ended search for occupants illustrates the danger that results when the majority's description of the community caretaker function combines with its statement of the public interest present in this case. As occurred here, officers could point to facts and——without demonstrating

---

[1] The record is unclear as to the exact timing of the officers' interaction with the tenant living in Matalonis's basement. At the beginning of his testimony at the suppression hearing, Officer Ruha indicated that he did not go into the basement during his search because no blood led into the basement. Rather than enter the tenant's room, the officers "waited till he came out to talk" to them. Later in his testimony, Officer Ruha indicated that he spoke with the tenant at approximately the same time he decided not to search the basement, saying, "I believe I talked to him right then and there in the basement."

probable cause or even reasonable suspicion——use those facts to set forth a theory that a person in a building requires immediate police assistance. Given that the public would then have an interest in the officers assisting the theoretical person inside the building, officers could enter the building and search it to determine whether there is in fact a person in need of assistance. Once officers enter the building, the plain view doctrine allows them to seize evidence of unrelated criminal activity that they encounter——even if the search ultimately reveals that the person to whom they attempted to provide care remains purely theoretical. Furthermore, officers may conduct their search for the theoretical person who might need care regardless of whether other law enforcement objectives affect their desire to enter the building[2]——such as probable cause or reasonable suspicion that they will encounter evidence of unrelated criminal activity inside——so long as a factual basis supports their community caretaking theory.

IV

¶111 The community caretaker exception recognizes the crucial role that law enforcement officers play in our society. The exception allows the State to rely on evidence that officers

---

[2] See Whren v. United States, 517 U.S. 806, 813 (1996) ("Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis."); State v. Kramer, 2009 WI 14, ¶29, 315 Wis. 2d 414, 759 N.W.2d 598 ("The reasoning of Whren is not inconsistent with the analysis in a community caretaker context, since police conduct is not based on probable cause or reasonable suspicion when a community caretaker function is ongoing.").

obtain when providing valuable services to the community. Officers frequently engage fellow citizens with no intention of investigating criminal activity, but sometimes they encounter evidence of criminal conduct during the course of those interactions. An officer engaged in a genuine community caretaking function will not and should not hesitate to assist members of the public when time is of the essence. Cf. Brigham City v. Stuart, 547 U.S. 398, 400 (2006) ("[P]olice may enter a home without a warrant when they have an objectively reasonable basis for believing that an occupant is seriously injured or imminently threatened with such injury.").

¶112 But the majority's embrace of a broad, ever-expanding version of the exception risks transforming a shield for evidence encountered incidental to community caretaking into an investigatory sword. Wisconsin already applies a generous interpretation of the exception. See 3 Wayne R. LaFave, Search and Seizure § 6.6 n.4, at 595 (5th ed. 2012) ("Because [Cady] stressed 'the distinction between motor vehicles and dwelling places,' it is commonly responded that the Cady doctrine is limited to vehicles."). Allowing law enforcement officers to conduct warrantless searches based on a mere theory of community need——and without making a showing of probable cause or even reasonable suspicion——completely undermines the Fourth Amendment's warrant requirement.

¶113 Because I believe the majority opinion unnecessarily expands this valuable exception, I respectfully dissent.

¶114 I am authorized to state that Justice SHIRLEY S. ABRAHAMSON and Justice ANN WALSH BRADLEY join this dissent.

1